THE LIBERTY COUNTY LAND, ETC. CO. *vs.* BARNES.

1. The stock of goods contained in the store when the lease in this case was given, and that with which it was replenished from time to time, were not a part of the plant of the machinery leased.

2. The defendant did not hold the stores in trust for the company, nor was he under obligation to keep and return to them an account of sales made of the same; nor can he be held accountable for mingling the goods subsequently purchased by him with those he originally bought from the plaintiff, so as to subject him to loss in case of his inability to distinguish the two.

(*a.*) The maxim of Lord Bacon that, "although the grant of a future interest is invalid, yet a declaration precedent may be made, which will take effect on the intervention of some new act," does not apply to this case, so as to show title in the company to the goods acquired after the lease, it appearing that after the lessee acquired the property, he did not do any act indicating his intention that they should pass under the contract, and he not having consented to the company's taking possession thereof.

Februa y 8, 1887.

Title. Words and Phrases. Vendor and Purchaser. Bailments. Contracts. Leases. Before Judge ADAMS. Liberty Superior Court. November Term, 1885.

This was an action of trover, brought by the Liberty County Land and Lumber Company, to recover a portion of goods taken from the commissary store at their establishment, and which, it seems, had been assigned by the ordinary of that county to Barnes, the defendant, as an exemption and homestead (so-called), under the constitution and laws of this State. The claim of this company for these goods grew originally out of this transaction. The company had leased for a term its saw-mill and appliances to Barnes ; and the portion of that lease material to the consideration of the questions made in this case is as follows :

"And the said party of the second part does also covenant and agree, for himself, his heirs, executors and administrators, to keep the said premises and property hereby leased in as good repair as he receives the same; to build all additional skids, tram and railroads, and to make any addition to the present plant necessary for the conduct of the business of said mill. All this the said party of the second part will do while he continues to occupy and use the same (fire, ordinary decay and natural wear and tear excepted), and will return the same to the party of the first part, its successors or assigns, in as good order and repair as he receives the same, except as before excepted, at the end and expiration of this lease. . . . And it is hereby mutually covenanted and agreed by and between the parties to these presents as follows: 1st. That at the termination of this lease, said party of the second part shall be at liberty to remove all personal property which he may have put on the premises, and such personal property as he does not see fit to remove before the termination of this lease shall belong to the party of the first part, its successors and assigns. . . . That if the rents hereby stipulated to be paid shall not be paid or covered by the draft of the said party of the second part, accepted by the said Reppard, as hereinbefore covenanted, within ten days from the end of any month when the rent for the month shall have accrued, that then the party of the first part, its successors or assigns, may enter upon and take possession of the premises and property hereby leased, and may terminate this lease for all intents and purposes, except to enable it to recover

any amount that may be due for rent at the time of such re-entry."

This lease was for five years from January 21, 1884, at a monthly rental of $1,010. The commissary store attached to this establishment, at the execution of the lease contained a little over $1,000 worth of goods, at prime cost in the city of Savannah. Before going into possession of these premises, Barnes gave the company a receipt in these words :

"Josselyn, Liberty County, Geo., January 22d, 1884.

"Received of H. B. Millen the property of the Liberty County Land and Lumber Company, consisting of the saw-mill property, engines and boilers, skids, logs, ways, track, buildings and all other appurtenances; also the planing machine, its engines, boiler and all its tools and appurtenances; also the locomotive and its tools and appurtenances, and log tracks now in use at station 3 3-4 S., F. & W. Ry., together with all the machinery, tram-roads, railroad iron, laid and not laid, mules, wagons, carts, tools, buildings, lands, timber and every other appurtenant belonging to the saw-mill and planing mill, or either of them, of the said company.

"This receipt embraces the inventory of the company's property as taken on August 15th, 1883; also all of the betterments and additions to plant made to the property of the company by H. B. Millen during his lease, as is more particularly set forth in exhibits marked No. 1 and No. 2, and includes the stock in commissary store as per inventory taken on January 21 and 22, 1884, by I. S. Sandford and R. Holland, being an aggregate of $1,019, being first cost at Savannah, and free of charge for freights and drayages.

J. D. Barnes."

Barnes suffered his rent to fall in arrears, and the company, for his failure to keep his covenant, sued out and levied a distress warrant upon this entire stock of goods, including that part of them turned over to him by the company, as well as the portion that he purchased subsequently to the lease to keep up the supply, and which he mingled with the old stock. After this distress warrant was levied, certain laborers who had performed service at this mill enforced their liens, and obtained executions against Barnes for their services. These executions were also levied upon this stock of goods. When this was done,

Barnes applied for and obtained an exemption, which, according to the testimony, included, with a few trivial exceptions as set forth, only the goods that he had purchased and brought into the stock after he got into possession. The company thereupon dismissed the levy of their distress warrant upon this stock of goods, and brought this action of trover, to recover possession of what remained, or what had been turned over to Barnes as a homestead, after satisfying the claims of these laborers, as his exemption. On the trial of this case, the jury found for the plaintiff only a few articles of trivial value, which had belonged to the old stock or furniture of this commissary department or country store, under this charge of the court:

"In order to recover in this case, it is necessary for the plaintiff, The Liberty County Land and Lumber Co., to prove its title to the property, or some part thereof, and the conversion of the property by the defendant, J. D. Barnes. Such goods as were turned over to Barnes and receipted for by him as the property of this company, was its property; the company has the title to such property as remained and was not disposed of by Barnes in the usual course of trade, and if he attempted to homestead it or otherwise converted it, the company is entitled to recover its value, and in addition to the value, you have the right to award interest and award the whole sum as damages. But, in the opinion of the court, whatever property was bought and put there by Barnes after taking possession of the stock was not the property of this company, but remained Barnes's property. If it be a fact that he (Barnes) put goods in the same store, and made them a part of the same stock that he got from the company, and did not keep them separate therefrom, this did not make them the property of the company. He had the right to dispose of the stock received from the plaintiff in the usual course of trade and put other goods in their place, but the goods so substituted did not become the goods of the plaintiff. In the opinion of the court, the sale by Barnes of any of the original stock turned over to him did not amount to a conversion; but if he took a homestead on any of this original property, this did amount to a conversion of such goods as he so attempted to homestead. Under the charge of the court, as I understand the case, the burden is on the plaintiff to show which of the goods remaining in the store were included in the property turned over to Barnes, and not on Barnes to show which of the goods remaining in the store were added by him to the stock received from the plaintiff."

The plaintiff moved for a new trial, assigning errors

specifically upon this charge.   The motion was overruled, and exceptions were taken.

CHISHOLM & ERWIN, for plaintiffs in error, cited : Code, §§2754, 2757, 3804, 1954 ; 2 Lowell, 458 ; 43 Am. R. 596 ; 65 N. Y. 459 ; 57 *Ga.* 36, 77 ; 58 *Id.* 571 ; 46 *Id.* 232 ; 65 *Id.* 134 ; Story Bail. 414, 294, 40 ; Code, §2089 ; 7 Cowen 752 ; Broom Leg. Max. 497 *et seq.*; 10 Exch. 298, 307, 311 ; 3 Hurl. & Nor. 967 ; 5 Ell. & Black. 830, 844 ; 112 Eng. C. L. R. 443 ; 95 *Id.* 470 ; 2 Lea. Cas. Eq. 230 ; Taylor Landl. & Ten. 290 ; 2 Wall. 491 ; 8 Cal. 36 ; L. R. 8 Eq. 626 ; 1 B. & A. 394 ; 7 Bing. 154 ; 7 M. & W. 14 ; 98 Mass. 55 ; Code, §3131.

DUBIGNON & FRASER, for defendant, cited : Code, §§2193, 2754, 2274, 2125, 3753 ; 71 *Ga.* 387 ; 70 *Id.* 367, 87 ; 68 *Id* 619 ; Rapalje & L. L. Dic. " plant ;" 45 *Ga.* 213 ; 50 *Id.* 426.

HALL, Justice.

The questions made by this record turn, in a great measure, upon the characters of the securities taken by the plaintiffs for the performance of the lease contract entered into with them by the defendant.

1. The first question made is this : Is the stock of goods contained in the store when the lease was given, and that with which it was replenished from time to time by the defendant, to be deemed, according to the contract between the parties, as any part of the " plant " of the machinery leased ?   We do not think so.   " Plant," as used in this sense, is, according to Webster, the " fixtures and tools necessary to carry on any trade or mechanical business." The goods in a promiscuous country store cannot with propriety be denominated either fixtures or tools essential to the conduct of the business of a mill to saw and plane lumber.   They are, so far as they have any connection with the milling business, to be taken rather as supplies for the

hands and others engaged in the prosecution of the work carried on in the forest, in felling trees and conveying logs to the mill to be sawed into lumber.

2. Nor do we agree with learned counsel for the plaintiff in error that the defendant held the stores in trust for the plaintiff company; nor was he under obligation to keep and return to them an account of sales made of the same. We do not think, therefore, he is chargeable with this duty and can be held accountable for mingling the goods subsequently purchased by him with those he originally bought from the plaintiff, of which it was contended he had charge, or of so confounding them with his own that the line of distinction between the two cannot be drawn; and thus, having thrown upon him all the inconvenience of causing the confusion, and in case of his inability to distinguish his own property, subjecting him to its loss. Code, §331. He was not carrying on this business on their account or for their benefit. The goods were turned over to him to be disposed of as he saw proper, nor was it incumbent on him to keep up the stock; it was optional with him to do this or to let it alone. In this respect, he could do as he pleased; and they retained no power to compel him to act otherwise than according to his own views upon this subject and in relation to that matter. As to the effects left on hand at the close of the lease being the property of the company, that question will more properly come up and be considered upon the main point of contention in this case, and that is, whether, under this contract, the defendant gave the plaintiff a lien upon, or made sales to them of, the property which he expected to acquire subsequently, and which in fact he did acquire after the execution of the lease and his receipt for the property leased, and whether the property thus acquired could be set apart as a homestead and exemption, under the laws of this State, without first paying them what was alleged to be the proper amount due for the same. At first the stock of

v 77—48

goods was treated by them as the defendant's property, and they sued out a distress warrant for their rent in arrear, and caused it to be levied on it; but when they as-certained that a homestead and exemption had been applied for and allowed, and that the laborers had levied executions founded on foreclosures of liens on the stock of goods, they dismissed the levy made on their distress warrant and abandoned the proceeding, and instituted trover to recover the goods set apart in the exemption to the defendant. They did not claim that the defendant's undertaking amounted to a mortgage upon goods "in bulk," but "changing in specifics" (code, §1951), but that the title to the goods, as well those in possession as those thereafter to be acquired, was to be conveyed to them as a security for the performance of defendant's covenants. They endeavor to obviate the legal difficulty that exists as to the conveyance of after-acquired property by an appeal to Lord Bacon's maxim that, "although the grant of a future interest is invalid, yet a declaration precedent may be made which will take effect on the intervention of some new act." (Broom's Maxims, 497). The first branch of this maxim relates to the sale and conveyance of a future interest, which cannot, as a general rule, under the law, be affected, and about which there is no dispute. It is upon the application of the latter branch of the maxim that the question is made.

"It remains then," says Mr. Broom (Broom's Legal Maxims, 500), "to consider the second part of Lord Bacon's rule above stated, viz. that a declaration, if followed by some act or conveyance, may be effectual in transferring property not actually in possession of the party at the time of making such declaration. For instance, a power contained in an indenture to seize future crops, if unexecuted, would be of no avail against an execution levied, as giving no legal or equitable title to any specific crops; yet if the power be subsequently executed by the grantee taking possession of the then growing crops, the seizure will be

good as against an execution afterwards levied; for the act done by the grantor is sufficient to give effect to the antecedent declaration, within the scope and meaning of Lord Bacon's maxim. Further, in commenting on the rule before us, Lord Bacon thus exemplifies the qualification with which it is to be received: 'If,' he says, 'there be a feoffment by a disseisee and a letter of attorney to enter and make livery of seisin, and afterwards livery of seisin is made accordingly, this is a good feoffment, although the feoffor had a right only at the time of making the feoffment; the reason assigned being that a deed of feoffment is but a matter of declaration and evidence, and there is a new act, that is to say, the livery subsequent, which gives effect and validity to the prior conveyance.' In like manner, 'if I grant unto J. S. authority by my deed to demise for years the land whereof I am now seized, or hereafter shall be seized, and after I purchase lands, and J. S., my attorney, doth demise them, this is a good demise, because the demise of my attorney is a new act, and all one with a demise by myself;' and 'where by deed indented a man represents himself as the owner of an estate, and affects to convey it for valuable consideration, having at the time no possession or interest in the estate, and where nothing therefore can pass, whatever be the nature of the conveyance, there if by any means he afterwards acquire an interest in the estate, he is estopped, in respect of the solemnity of the instrument, from saying, as against the. other party to the indenture, contrary to his averment in that identure, that he had not such interest at the time of its execution.' In a modern case also, we read that 'At law, an assignment of a thing which has no existence, actual or potential, at the time of the execution of the deed, is altogether void. But where future property is assigned, and after it comes into existence, possession is either delivered by the assignor, or is allowed by him to be taken by the assignee, in either case there would be the *novus actus interveniens* of the maxim of Lord Bacon,

and the property would pass.'" Again, this same author says, " We may conclude accordingly that, although, subject to the restrictions above stated, a grant of goods which are not in existence, or do not belong to the grantor at the time of executing the deed, is void, yet the grantor may ratify his grant by some act done by him with that view, after he has acquired the property in the goods, or by some act indicating his intention that they should pass under the deed already executed." There is much more to the same effect in this author. See *passim,* pp. 498 to 563, inclusive.

It does not strike us that the defendant consented, at the time of the levy of this distress warrant or subsequently, to the party's going into possession of this property. On the contrary, he dissented from this new act, and did all in his power to prevent its consummation. For that reason we think this law inapplicable to the case; although the position was ingeniously assumed and maintained with great plausibility and power of argument by the learned counsel who represented the plaintiffs in error, yet our impression is that his reasoning on the question is rather plausible than sound. There is a perfect wealth of cases cited in the notes of Mr. Broom in his " commentaries," on this maxim of Lord Bacon, to which we refer those in search of information upon this interesting subject.

Being of opinion that there was no error in the refusal of this new trial, we direct that the judgment below be affirmed.